IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

JOHN J. CONNERTON, JR.,

                            Plaintiff,

                                                    Civil Action No.:   5:20-cv-159 (DNH/ATB)

        -against-

ROMAN CATHOLIC DIOCESES OF
SYRACUSE, NEW YORK, CATHOLIC
CENTRAL HIGH SCHOOL, a/k/a CATHOLIC
SCHOOLS OF BROOME COUNTY a/k/a SETON         DEMAND FOR JURY TRIAL
CATHOLIC CENTRAL HIGH SCHOOL OF
BROOME COUNTY, ST. THOMAS AQUINAS
CHURCH, ROBERT KLOSTER, and DAVID
PICHETTE,

                            Defendants.

## COMPLAINT

### A.  Introductory Statement

1.      The Roman Catholic Diocese of Syracuse, New York (the "Diocese") fostered

and perpetuated a culture that permitted former priests Robert Kloster ("Kloster"), David

Pichette ("Pichette"), and Thomas Zedar ("Zedar") to sexually abuse Plaintiff John J.

Connerton, Jr. ("John") as a child.  Kloster, Pichette and Zedar were employed by the Diocese

and served the Diocese in various positions of trust and authority throughout their tenures.

Kloster, Pichette and Zedar abused their positions as priests, teachers and school administrators

to methodically groom and prey on John in furtherance of their own sexual gratification.  All

the while, the Diocese was negligent in its hiring, supervision and retention of the clergy under

its employ, by failing to protect John from the abuse he endured while under their care.  For

years, the Diocese successfully concealed these sexual offenders by transferring them from

parish to parish and/or school to school until ultimately removing them from the priesthood as a

result of their ongoing exploitation of children.  Unfortunately for John, their removal was too late, as John sustained severe physical and psychological injuries and damages from the pervasive sexual abuse he endured, giving rise to this lawsuit as described herein hereinafter.

### B.  Jurisdiction and Venue

2.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332, as there is diversity of citizenship.

3.      Plaintiff John J. Connerton, Jr., an adult individual, resides at 1440 Carrollton Parkway, Apartment 13202, Carrollton, Texas, 75010.

4.      At all material times, the Diocese was and continues to be an organization or entity which includes but is not limited to, civil corporations, decision making entities, officials, and employers, authorized to conduct business and is or was conducting business in the State of New York, with its principal place of business at 240 E. Onondaga Street, Syracuse, New York 13202.

5.      Catholic Central High School a/k/a Catholic Schools of Broome County a/k/a Seton Catholic Central High School of Broome County is part of the Diocese charged with managing the Catholic schools in Broome County, New York, and is headquartered at 70 Seminary Avenue, Binghamton, New York 13905.

6.      Saint Thomas Aquinas Church is part of the Diocese and is located at 1 Aquinas Street, Binghamton, New York 13905.

7.      Upon information and belief, Defendant Robert Kloster, an adult individual, resides at 129 Ramona Point Road, Old Forge, New York, 13420.

8.      Upon information and belief, Defendant David Pichette, an adult individual resides at 17051 NE 35th Avenue, Apartment 308, North Miami Beach, Florida, 33160.

9.      The amount in controversy is in excess of $75,000.00 excluding interest and costs.

10.     The Northern District of New York is the proper venue pursuant to 28 U.S.C. § 1391(b) as the Diocese is headquartered in Syracuse, New York.  In addition, the offending clergy were employed in a church and a school located in Binghamton, New York.

## C.  Choice of Law

11.     The claims asserted by John against the Defendants are governed by New York State Law, as most of the events giving rise to this action occurred in New York State.[1]

12.     Catholic Central High School a/k/a Catholic Schools of Broome County a/k/a Seton Catholic Central High School of Broome County is chartered under New York State law.

13.     The offending clergy were employed by the Diocese in New York State.  The recently enacted "Child Victims Act," which encompasses New York Civil Practice Law and Rules § 214-g, revives civil claims pertaining to physical, psychological, or other injury or condition arising from sexual offenses committed against minors as a consequence of the intentional or negligent acts or omissions by any party.

---

[1]  In addition to the abuse and rapes in New York, Pichette raped John on a ski trip in Canada. Zedar raped John in Wildwood, New Jersey

### D.  The Defendants

*1.  The Institutional Defendants*

14.     The Diocese, formed in 1886, covers seven counties in Central and South Central New York, including Broome County.  The Diocese is controlled by a Bishop, who is appointed by the Pope.

15.     At the relevant times herein, the Diocese employed about 400 priests, and ran 13 Catholic high schools.

16.     The Diocese had several programs and activities that sought participation of children, including but not limited to, schools, religious education, and other educational programs.  The Diocese, through its officials, had and has complete control over these programs and activities involving children.  The Diocese had the exclusive power to appoint, hire, train, supervise, monitor, remove, suspend, and terminate each and every person working with children within the Diocese.

17.     Pursuant to a charter in or around 1963 the Diocese formed Catholic Central High School, a/k/a Catholic Schools of Broome County. Catholic Schools of Broome County is a division of the Diocese responsible for managing and supervision all of Catholic elementary and high schools in Broome County. While still under the control and oversight of the Diocese, Catholic Schools of Broome County founded and operated Seton Catholic Central High School of Broome County ("Seton")[2].

18.     Saint Thomas Aquinas Church ("St. Thomas") was founded by the Diocese in 1927.  Located less than one mile apart, St. Thomas maintained a close partnership with Seton.

---

[2] Prior to 1977 Seton Catholic Central High School went by the name Catholic Central.

19.     Another program within the control of the Diocese, was the altar boy program at St. Thomas Aquinas Church ("St. Thomas"), in Binghamton, New York.

20.     The Diocese employed, retained and supervised Kloster, Pichette and Zedar, and held them out to be safe and trustworthy with the supervision, care, custody and control of children.

21.     The Diocese ran Seton and St. Thomas during the period of John's sexual abuse through the present and at all times was responsible for hiring, placement and supervision of priests throughout its seven county region.

22.     To the extent that the Diocese, Catholic Schools of Broome County, Seton, or St. Thomas were different entities, corporations or organizations during the period Kloster, Pichette and Zedar used their positions as priests, teachers and school administrators to sexually abuse John, such entities, corporations, or organizations are hereby on notice that they are intended to be defendants in this lawsuit.  Any such Diocese related entities, corporations, or organizations are collectively referred to herein as the "Diocese".

23.     The hierarchy of the Roman Catholic Church and the Diocese have been aware of the serious problem of clergy sexual abuse of children for more than 100 years.

24.     Further, the Roman Catholic Church officials, including the Diocese, have used their power and influence to prevent victims and their families from disclosing allegations of abuse.

25.     The Diocese engaged in the well-known practice of transferring sexual offender priests to a different parish or school to cover up their abusive and predatory tactics.

26.     On January 6, 2002 the Boston Globe published an article that revealed the rampant sexual abuse by priests, and cover up within the Catholic Church.

27.     Thereafter, in 2002, the Roman Catholic Church in the United States promulgated the "Charter for the Protection of Children & Young People" (the "Charter"), aimed at putting in place better measures to stymie the widespread sexual abuse of children within the Catholic Church.

28.     Under the Charter, the Diocese removed priests based upon credible evidence of sexual abuse of children.

*2.   Thomas Zedar*

29.     Thomas Zedar was ordained as a Roman Catholic priest in 1965 by the Diocese. and served as Principal of Seton from 1972 until 1976.  In 1976, Zedar was promoted to the newly created position of Superintendent of Catholic Schools of Broome County, where he served the Diocese until 1980.

30.     As Principal of Seton, and later Superintendent of the Catholic Schools of Broome County, Zedar was a local embodiment of the Diocese and direct conduit between Seton and the Bishop.  As such, Zedar retained a high level of authority and autonomy.

31.     In 1980, Zedar was transferred to Our Lady of Lourdes Church in Windsor, New York.  In 1988, Zedar was transferred again, this time out of the Diocese.  Between 1988 and 2003, Zedar was transferred to at least six (6) different parishes in the Diocese of Venice, Florida until finally being removed from the priesthood pursuant to the Charter.

32.     Zedar died in 2009, and his estate was not probated.

### 3.  David Pichette

33.    Defendant David Pichette was ordained as a Roman Catholic priest in 1967 by the Diocese.  Pichette was assigned to St. Patrick's in Truxton, New York, then transferred to Bishop Ludden High School in Syracuse, New York.  Sometime prior to 1974, Pichette was transferred again to Seton, where he taught Christian Doctrine.

34.    Pichette owned a cabin in McGraw, New York, and at the relevant times hereto, it was widely known that Pichette would bring minor boys from Seton to his cabin.

35.    At all relevant times herein, Pichette headed up the Mission Club at Seton, which included an annual retreat to Nazareth Farm in West Virginia, where he took Seton students. Pichette had a reputation for inappropriate conduct towards the Seton students that went to this retreat.

36.    Pichette left Seton in 1979 and went to work full time at Nazareth Farm.  In 1981, 17 year-old Daniel Franz allegedly reported Pichette for sexually abusing him at Nazareth Farm.

37.    In 1988, Pichette left Nazareth Farm and returned to the Diocese, where he was transferred to 4 parishes in 5 years before being suspended from acting as a priest in 1993.

38.    Pichette was ultimately dismissed as a priest in 2005 under the Charter.

### 4.  Robert Kloster

39.    Defendant Robert Kloster was ordained as a Roman Catholic priest in 1965. Kloster served at St. Thomas.

40.    Kloster was transferred throughout the Diocese at least ten (10) times before being removed as priest by the Diocese in 2002 under the Charter.

### E.  The Abuse

41.     Plaintiff John J. Connerton, Jr., was born on April 2, 1959 and lived with his family in Binghamton, Broome County, New York.

42.     John and his family were devout Catholics and parishioners at St. Thomas.  They attended services regularly during both the week and weekend.  John also attended Catholic School, including Seton from 1974 until he graduated in 1977. John's parents instructed him to trust and obey the respected clergy at these institutions.

43.     At both St. Thomas and Seton, various trusted members of the Diocese took advantage of their positions as priests, teachers and administrators, and began grooming John with the goal of seducing and sexually abusing John.

44.     Grooming is defined as an adult befriending and establishing an emotional connection with a child, and sometimes the family, to lower the child's inhibitions with the objective of sexual abuse.

45.     As set forth in detail hereinafter, Kloster, Pichette and Zedar methodically groomed John for the perverse purpose of sexually abusing him.

46.     As a vulnerable minor and student, John was subject to the ongoing domination, manipulation and control of Zedar, Pichette and Kloster, all of whom stole John's innocence, trust and faith.

### 1.  Abuse by Kloster

47.     John's nightmare at the hands of, and under the watch of the Diocese, began when John met Kloster as an altar boy at St. Thomas in the fifth grade (1969).

48.     Kloster was present at both Sunday mass and the 5:20 P.M. weekday mass.  John would serve as an altar boy during both Sunday mass and the 5:20 P.M. weekday mass.  The 5:20 P.M. weekday mass only had one altar boy.

49.     On numerous occasions, Kloster hugged, kissed, and made out with John following the 5:20 P.M. weekday mass, where there were no other people around.

50.     The unwelcomed hugging, kissing and making out continued until Kloster was transferred out of St. Thomas.  However, unfortunately for John, the nightmare continued.

51.     Upon information and belief, Kloster was transferred out of St. Thomas so the Diocese could conceal Kloster's sexual abuse of children.

### 2.  Abuse by Pichette

52.     John met Pichette when he started his freshman year at Seton in 1973.  John was 14 years old.

53.     Shortly after Pichette met John, Pichette would search for him in study hall and detention on a daily basis.  Pichette pulled John out of study hall or detention, telling John that he needed "tutoring".  The "tutoring" was Pichette's method of grooming John and was conducted in conjunction with his duties as priest and teacher.

54.     The "tutoring" was held in Pichette's office, a small audio/video (A/V) room.  It had one entrance/exit.  Initially, Pichette "tutored" John by sitting uncomfortably close to him, whispering, and asking personal questions. Pichette's whispers included questions about the girls John liked and what John was going to do over the weekend.

55.     After a few "tutoring" sessions wherein Pichette continued to groom John, the "tutoring," escalated to Pichette forcibly kissing John, which became an almost daily occurrence.

56.     John was trapped; he did not want to be alone with Pichette but he could not leave or say no. Further, John was embarrassed, ashamed and helpless and was fearful that if his friends found out about Pichette's abuse they would think John was homosexual.

57.     In anticipation of the unwanted advances by Pichette, John spent his school days attempting to hide from Pichette. John was successful approximately 50% of the time; unfortunately, John was unsuccessful almost every other day.

58.     Over the course of "tutoring", Pichette continued to intensify and escalate his sexual abuse of John, including embracing John, fondling John's genitals, and forcing John to fondle Pichette's genitals.  John was unsuccessful every time he endeavored to rebuff Pichette's sexual abuse.

59.     Outside of school, Pichette used his role as priest and teacher to gain the trust of John's parents and commit further sexual abuse against John.

60.     On numerous occasions, Pichette took John skiing at Greek Peak Ski Resort, in Virgil, New York.  Pichette continued to groom and manipulate John by bringing backpacks full of beer, purchasing John's ski passes, and letting John drink and smoke cigarettes on the ski lifts and in the car.

61.     Pichette used these ski trips to sexually abuse John on the ski lifts and in the parking lot by forcibly kissing him and fondling John's genitals.

62.     On these ski trips, John was trapped—he had no means of exiting and could not say no to Pichette's advances; Pichette justified his sexual abuse to John by saying "priests need love too."

63.     Pichette took John on a ski trip to Mount Tremblant, Canada, where they stayed at a monastery with four to five other priests and cooks.

64.     Pichette woke John up in the middle of the night, began kissing him, then anally raped him.  This rape was physically painful and psychologically devastating.

65.     John was trapped—he did not want to be alone with Pichette but he could not leave or say no.

66.     John was unable to report the sexual assault because he was so embarrassed, ashamed and helpless and was fearful that if his friends and family found out they would not believe him or think he was homosexual.

67.     In addition to the ski trips, Pichette took John on several trips to his cabin in McGraw, New York.

68.     On these trips Pichette intentionally overheated the cabin to the point of discomfort to force John to take off his clothes. It became understood that on these trips there was an expectation that John had to take off all of his clothes.

69.     Pichette would also remove his clothes, kiss John and fondle John's genitals and would take John's hand and made him stroke Pichette's genitals.  Pichette would also ejaculate on John.

70.     On some of the trips to the cabin, Pichette forced John to perform oral sex.

71.     On one trip to the cabin, Pichette and John swam naked. After swimming naked, John laid face down on a towel. Pichette crawled on top of John and anally raped him. This rape was physically painful and psychologically devastating.

72.     On another occasion, Pichette forced John to perform oral sex. During the act, Pichette stopped John and proceeded to anally rape him again.

73.     On another trip, Pichette tried to perform oral sex on John, but John could not get an erection. Thereafter, Pichette told John to bend over and forcefully anally raped him.

74.     All the while, Pichette attempted to justify his abhorrent abuse by claiming that he was showing his love for John and telling John, "priests need love too."

75.     On each trip to the cabin, John was trapped—he could not leave the cabin and could not say no to Pichette's abuse.

76.     John was unable to report the sexual assault because he was so embarrassed, ashamed and helpless and was fearful that if his friends and family found out they would not believe him or think he was homosexual.

77.     Pichette's sexual abuse continued through John's sophomore year at Seton.

### 3. Abuse by Zedar

78.     Zedar became Principal of Seton at the outset of John's junior year.

79.     Zedar began grooming John on school days by, among other things, asking John if he wanted to drive his Firebird sports car and asking John and other boys if they wanted to go out to a restaurant for lunch, with him in his Firebird.

80.     Eventually, Zedar stopped inviting the other boys and would take John to his home instead of a restaurant.

81.     Zedar resided in a Diocese owned property located near Seton.

82.     Zedar's grooming of John continued at his home over the course of several school-day lunches. Zedar would offer John beer, get him drunk, and they would hangout. Zedar also showed up frequently at John's parents' house.

83.     Zedar's grooming of John was committed in conjunction with his duties as a principal and priest.

84.     After a few lunches at Zedar's home, Zedar's behavior towards John escalated from just drinking beer to Zedar forcibly kissing John, forcing John to perform oral sex, and ultimately anally raping John.

85.     Zedar would also kiss and fondle John in the Principal's office at Seton.

86.     On each occasion that John was forced to go to Zedar's home or office, John was trapped—he could not leave and could not say no to Zedar's abuse.

87.     In the summer between John's junior and senior year, Zedar asked John's parents if he could take John to Wildwood, New Jersey for a weekend.

88.     In Wildwood, New Jersey, Zedar got a hotel room with only one king bed. Throughout the weekend, Zedar repeatedly got John drunk and anally raped him.  This rape was physically painful and psychologically devastating.

89.     In Wildwood, New Jersey, John was trapped—he could not leave and could not say no Zedar's abuse.

90.     Zedar's abhorrent and criminal behavior was rewarded and hidden by the Diocese; Zedar was appointed to the newly created position of superintendent.

91.     Because Zedar was the principal and then superintendent, John believed there was no authority he could report the sexual abuse to.

92.     Further, John was unable to report the sexual assault because he was so embarrassed, ashamed and helpless and was fearful that if his friends and family found out they would not believe him or think he was homosexual.

### The Years of Abuse Devastated and Derailed John

93.     After graduating from Seton, John completed one year at Broome Community College ("BCC").

94.     After finishing his first year at BCC, John could no longer take living in Binghamton, New York, as it was the epicenter of his trauma. His depression was so intense, that he bought a $300 motorcycle and drove to Texas with only the possessions he could physically carry.

95.     After arriving in Texas, John experienced intense pain in his anus, which he believed was caused by the motorcycle ride.  John sought medical attention. Much to is horror, the doctor asked John "do you have a boyfriend?" The doctor diagnosed him with venereal warts, which took several doctor visits to treat and was extremely painful.

96.     At this time, John had not engaged in sexual intercourse with anyone other than Pichette and Zedar through the numerous rapes he endured, as detailed herein.

97.     Connerton contracted venereal warts through the rapes he endured at the hands of Pichette and Zedar.

98.     Neither Pichette nor Zedar informed John they were infected with venereal warts, in violation of NY Pub Health Law § 2307 (effective June 1, 1954), which placed an affirmative duty on a person with a venereal disease to inform his or her sexual partners of that disease.

99.     John has Post-Traumatic Stress Disorder (PTSD), anxiety, severe depression, chronic migraines, and has been medicated his entire adult life caused by the sexual abuse he endured.

100.    John also suffers from problems with intimacy. He has an active sex drive and gets excited about the thought of being with a woman, but he feels like sex is something he should not be doing and feels dirty.

101.    John's problems with intimacy include premature ejaculation.

102.    In an effort to self-medicate, John suffers from substance abuse and dependency.

103.    The sexual abuse John endured derailed and ultimately ruined his life.

**The Diocese Knew of the Sexual Abuse and Concealed It**

104.    On December 1, 2018 the Roman Catholic Diocese of Syracuse published a letter disclosing the identity of 57 priests with credible sexual abuse accusations.

105.    Some of the sexual abuse accusations contained within the letter date back as early as 1950.

106.    Kloster, Pichette and Zedar were all named on the list of priests with credible accusations of sexual abuse.

107.    Upon information and belief, the Dioccse knew of sexual abuse committed by Kloster, Pichette and Zedar before they preyed on John.

108.    At all relevant times hereto, the Diocese, its agents, servants and employees knew or shold have known that Kloster, Pichette and Zedar were known sexual abusers of children, and that sexual abuse of John was ongoing.

109.    Upon information and belief, the Diocese recklessly disregarded its knowledge that Kloster, Pichette and Zedar used their positions to sexually abuse children, including John.

110.   Upon suspecting and/or learning of sexual abuse committed by Kloster, Pichette, and Zedar, the Dioceses failed to act.  Instead, the Diocese actively concealed the sexual abuse.

111.   Upon information and belief, the Diocese relocated Kloster, Pichette and Zedar, who committed sexual abuse to Binghamton to aid in concealment of sexual abuse, and thereafter continued to relocate them to new parishes and schools.

112.   The sexual abuse of John could not have occurred if Kloster, Pichette and Zedar had not been employed and retained by the Diocese.

## COUNT I

### ASSAULT

### *John J. Connerton, Jr. v. All Defendants*

113.   Plaintiff repeats, reiterates, and realleges each and every allegation set forth in preceding paragraphs as though fully set forth herein.

114.   As set forth herein, the Defendants intentionally placed John in fear of imminent harm or offensive contact.

115.   John believed the Defendants had real and apparent ability to bring about harmful and/or offensive contact to John, given the Defendants' pattern of harmful and/or offensive contact towards John.

116.   Kloster, Pichette and Zedar were entrusted by the Diocese to educate, care for, supervise and provide spiritual guidance for children, including John.

117.   The Diocese/Institutional Defendants are responsible for the acts of sexual abuse committed by Kloster, Pichette and Zedar as the sexual abuse was committed in furtherance of the Diocese's business of educating and spiritually guiding children.

16

118.    The Diocese/Institutional Defendants are responsible for the acts of sexual abuse committed by Kloster, Pichette and Zedar as the sexual abuse was committed by employees of the Diocese while engaged in the performance of their duties as priests, teachers and/or administrators.

119.    The Diocese/Institutional Defendants provided Kloster, Pichette and Zedar access to John and facilitated the means and the premises for Kloster, Pichette and Zedar to isolate and abuse John, including the church, the A/V room at Seton, the principal's office and the principal's residence.

120.    The Diocese/Institutional Defendants provided Pichette and Zedar access to John and facilitated the means by which Pichette and Zedar would take John out of town to isolate and abuse John, including molesting and raping John at Mount Tremblant, Pichette's cabin, Greek Peak, and Wildwood, New Jersey.

121.    John is entitled to damages in an amount to be determined at the trial of this action.

## COUNT II

### BATTERY

### *John J. Connerton, Jr. v. All Defendants*

122.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in preceding paragraphs as though fully set forth herein.

123.    As set forth herein, the Defendants intentionally touched and molested John, which was wrongful under all circumstances.

124.    The contact by the Defendants was harmful or offensive for several reasons, including, but not limited to the following:

17

a.     Sexual molestation of a minor is inherently harmful;

b.     Psychological suffering from humiliation and shame; and

c.     The acts robbed John of his personal dignity.

125.   John did not consent to the touching, nor could he because he was a minor.

126.   Kloster, Pichette and Zedar were entrusted by the Diocese to educate, care for, supervise and provide spiritual guidance for children, including John.

127.   The Diocese/Institutional Defendants are responsible for the acts of sexual abuse committed by Kloster, Pichette and Zedar as the sexual abuse was committed in furtherance of the Diocese's business of educating and spiritually guiding children.

128.   The Diocese/Institutional Defendants are responsible for the acts of sexual abuse committed by Kloster, Pichette and Zedar as the sexual abuse was committed by employees of the Diocese while engaged in the performance of their duties as priests, teachers and/or administrators.

129.   The Diocese/Institutional Defendants provided Kloster, Pichette and Zedar access to John and facilitated the means and the premises for Kloster, Pichette and Zedar to isolate and abuse John, including the church, the A/V room at Seton, the principal's office and the principal's residence.

130.   The Diocese/Institutional Defendants provided Pichette and Zedar access to John and facilitated the means by which Pichette and Zedar would take John out of town to isolate and abuse John, including molesting and raping John at Mount Tremblant, Pichette's cabin, Greek Peak, and Wildwood, New Jersey.

131.   Plaintiff is entitled to damages in an amount to be determined at the trial of this action.

## COUNT III

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### *John J. Connerton, Jr. v. All Defendants*

132.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in preceding paragraphs as though fully set forth herein.

133.    As set forth herein, the Defendants engaged in extreme and outrageous conduct through their sexual molestation of John. The kissing, touching, fondling, rape, etc. of a minor are outside the bounds of decency and are atrocious and utterly intolerable in a civilized community.

134.    The Defendants' conduct intentionally caused John emotional distress. The emotional distress was foreseeable, because it was substantially certain to follow under circumstances where an adult forcibly engages in sex acts with a minor.

135.    The emotional distress John has endured is severe. It has affected John's psychology from the time of his encounters with the Defendants through the present, and has manifested through severe depression, PTSD, sexual dysfunction, chronic migraines, etc.

136.    Kloster, Pichette and Zedar were entrusted by the Diocese to educate, care for, supervise and provide spiritual guidance for children, including John.

137.    The Diocese/Institutional Defendants are responsible for the acts of sexual abuse committed by Kloster, Pichette and Zedar as the sexual abuse was committed in furtherance of the Diocese's business of educating and spiritually guiding children.

138.    The Diocese/Institutional Defendants are responsible for the acts of sexual abuse committed by Kloster, Pichette and Zedar as the sexual abuse was committed by employees of

the Diocese while engaged in the performance of their duties as priests, teachers and/or administrators.

139.   The Diocese/Institutional Defendants provided Kloster, Pichette and Zedar access to John and facilitated the means and the premises for Kloster, Pichette and Zedar to isolate and abuse John, including the church, the A/V room at Seton, the principal's office and the principal's residence.

140.   The Diocese/Institutional Defendants provided Pichette and Zedar access to John and facilitated the means by which Pichette and Zedar would take John out of town to isolate and abuse John, including molesting and raping John at Mount Tremblant, Pichette's cabin, Greek Peak, and Wildwood, New Jersey.

141.   John is entitled to damages in an amount to be determined at the trial of this action.

## COUNT IV

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### *John J. Connerton, Jr. v. All Defendants*

142.   Plaintiff repeats, reiterates, and realleges each and every allegation set forth in preceding paragraphs as though fully set forth herein.

143.   The Defendants owed John a duty of reasonable care.

144.   The Defendants breached this duty when they sexually abused and molested John, and allowed John to be sexually abused and molested.

145.    The severe sexual abuse John endured at the hands of the Defendants caused John extreme emotional distress, which resulted in significant mental injuries, including, but not limited to the following:

        a.      Severe depression;

        b.      Post-Traumatic Stress disorder ("PTSD");

        c.      Sexual dysfunction;

        d.      Chronic Migraines

        e.      Anxiety; and

        f.      Substance abuse.

146.    John's claim possesses a guarantee of genuineness.

147.    Kloster, Pichette and Zedar were entrusted by the Diocese to educate, care for, supervise and provide spiritual guidance for children, including John.

148.    The Diocese/Institutional Defendants are responsible for the acts of sexual abuse committed by Kloster, Pichette and Zedar as the sexual abuse was committed in furtherance of the Diocese's business of educating and spiritually guiding children.

149.    The Diocese/Institutional Defendants are responsible for the acts of sexual abuse committed by Kloster, Pichette and Zedar as the sexual abuse was committed by employees of the Diocese while engaged in the performance of their duties as priests, teachers and/or administrators.

150.    The Diocese/Institutional Defendants provided Kloster, Pichette and Zedar access to John and facilitated the means and the premises for Kloster, Pichette and Zedar to isolate and abuse John, including the church, the A/V room at Seton, the principal's office and the principal's residence.

151.    The Diocese/Institutional Defendants provided Pichette and Zedar access to John and facilitated the means by which Pichette and Zedar would take John out of town to isolate and abuse John, including molesting and raping John at Mount Tremblant, Pichette's cabin, Greek Peak, and Wildwood, New Jersey.

152.    John is entitled to damages in an amount to be determined at the trial of this action.

## COUNT V

### NEGLIGENT SPREADING OF A VENEREAL DISEASE (NEGLIGENCE PER SE)

#### *John J. Connerton, Jr. v. Pichette and The Institutional Defendants*

153.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in preceding paragraphs as though fully set forth herein.

154.    Upon information and belief, Pichette and/or Zedar knew they were infected with the infectious venereal disease, venereal warts.

155.    Pichette and/or Zedar did not tell John they were infected with an infectious venereal disease.

156.    Neither Pichette nor Zedar took any preventative measures, such as wearing a condom while raping John.

157.    Pursuant to NY Public Health Law § 2307 (enacted 1953), a person who knowingly is infected with a venereal disease and has sexual intercourse with another is guilty of a misdemeanor.

158.    Under NY Public Health Law § 2307, Pichette and/or Zedar had an affirmative duty to inform their sexual partners that they were infected with a venereal disease.

159.    As a consequence of contracting venereal warts from Pichette and/or Zedar, John suffered injury including, but not limited to the following:

    a.    Pain and suffering from the burning and itching from the warts and from the freezing/cauterization treatment;

    b.    Humiliation and shame from the stigma of having a sexually transmitted disease; and

    c.    Embarrassment and shame because his doctor inquired into whether he had a boyfriend, implying John is homosexual, which he is not.

160.    Pichette and Zedar were entrusted by the Diocese to educate, care for, supervise and provide spiritual guidance for children, including John.

161.    The Diocese/Institutional Defendants are responsible for the acts of sexual abuse committed by Kloster, Pichette and Zedar as the sexual abuse was committed in furtherance of the Diocese's business of educating and spiritually guiding children.

162.    The Diocese/Institutional Defendants are responsible for the acts of sexual abuse committed by Pichette and Zedar as the sexual abuse was committed by employees of the Diocese while engaged in the performance of their duties as priests, teachers and/or administrators.

163.    The Diocese/Institutional Defendants provided Pichette and Zedar access to John and facilitated the means and the premises for Pichette and Zedar to isolate and abuse John, including the church, the A/V room at Seton, the principal's office and the principal's residence.

164.    The Diocese/Institutional Defendants provided Pichette and Zedar access to John and facilitated the means by which Pichette and Zedar would take John out of town to isolate

23

and abuse John, including molesting and raping John at Mount Tremblant, Pichette's cabin,

Greek Peak, and Wildwood, New Jersey.

165.    John is entitled to damages in an amount to be determined at the trial of this

action.

## COUNT VI

### FALSE IMPRISONMENT

*John J. Connerton, Jr. v. All Defendants*

166.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in

the preceding paragraphs as though fully set forth herein.

167.    As set forth herein, the Defendants intended to confine John in furtherance of

their own sexual gratification.

168.    John was conscious of his confinement.

169.    John did not consent to the confinement. At all times herein, John did not want to

be alone with the individual Defendants.

170.    John's confinement was not otherwise privileged.

171.    Kloster, Pichette and Zedar were entrusted by the Diocese to educate, care for,

supervise and provide spiritual guidance for children, including John.

172.    The Diocese/Institutional Defendants are responsible for the acts of sexual abuse

committed by Kloster, Pichette and Zedar as the sexual abuse was committed in furtherance of

the Diocese's business of educating and spiritually guiding children.

173.    The Diocese/Institutional Defendants are responsible for the acts of sexual abuse

committed by Kloster, Pichette and Zedar as the sexual abuse was committed by employees of

the Diocese while engaged in the performance of their duties as priests, teachers and/or administrators.

174.    The Diocese/Institutional Defendants provided Kloster, Pichette and Zedar access to John and facilitated the means and the premises for Kloster, Pichette and Zedar to isolate and abuse John, including the church, the A/V room at Seton, the principal's office and the principal's residence.

175.    The Diocese/Institutional Defendants provided Pichette and Zedar access to John and facilitated the means by which Pichette and Zedar would take John out of town to isolate and abuse John, including molesting and raping John at Mount Tremblant, Pichette's cabin, Greek Peak, and Wildwood, New Jersey.

176.    John is entitled to damages in an amount to be determined at the trial of this action.

## COUNT VII

### NEGLIGENT HIRING

*John J. Connerton, Jr. v. The Institutional Defendants*

177.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in preceding paragraphs as though fully set forth herein.

178.    Kloster, Pichette and Zedar were in possession of a vicious propensity to sexually abuse children.

179.    The Diocese knew or should have known of Kloster, Pichette, and Zedar's vicious propensities and failed to investigate and/or turned a blind eye to said propensities when the Diocese hired Kloster, Pichette, and Zedar as priests and/or teachers and/or school officials.

25

180.    Because the Diocese knew or should have known of Kloster, Pichette, and Zedar's propensities to sexually abuse children, the Diocese could have anticipated the harm committed by Kloster, Pichette, and Zedar against John through their employment, especially because their roles as priests, teachers and the principal, conferred upon them a heightened degree of trust.

181.    Had the Diocese not hired Kloster, Pichette, and Zedar, the sexual abuse of John would not have occurred.

182.    The Diocese negligent hiring of Kloster, Pichette, and Zedar caused John to be sexually abused as set forth herein.

183.    John is entitled to damages in an amount to be determined at the trial of this action.

## COUNT VIII

### NEGLIGENT RETENTION

#### *John J. Connerton, Jr. v. The Institutional Defendants*

184.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in preceding paragraphs as though fully set forth herein.

185.    Kloster, Pichette and Zedar were in possession of a vicious propensity to sexually abuse children.

186.    The Diocese knew or should have known of Kloster, Pichette, and Zedar's vicious propensities and failed to investigate and/or turned a blind eye to said propensities when the Diocese retained Kloster, Pichette, and Zedar as priests and/or teachers and/or school officials.

26

187.     Because the Diocese knew or should have known of Kloster, Pichette, and Zedar's propensities to sexually abuse children, the Diocese could have anticipated the harm committed by Kloster, Pichette, and Zedar against John through their employment, especially because their roles as priests, teachers and the principal conferred upon them a heightened degree of trust.

188.     The Diocese failed to act reasonably through its failure to remove Kloster as a priest, Pichette as a priest and teacher, and Zedar as a priest and principal.

189.     The Diocese negligent retention of Kloster, Pichette, and Zedar caused John to be sexually abused as set forth herein.

190.     John is entitled to damages in an amount to be determined at the trial of this action.

## COUNT IX

### NEGLIGENT SUPERVISION

#### *John J. Connerton, Jr. v. The Insitutional Defendants*

191.     Plaintiff repeats, reiterates, and realleges each and every allegation set forth in preceding paragraphs as though fully set forth herein.

192.     Kloster, Pichette and Zedar were in possession of a vicious propensity to sexually abuse children.

193.     The Diocese knew or should have known of Kloster, Pichette, and Zedar's vicious propensities and failed to investigate and/or turned a blind eye to said propensities when the Diocese negligently supervised Kloster, Pichette and Zedar as priests, teacher and principal.

194.    Because the Diocese knew or should have known of Kloster, Pichette, and Zedar's propensities to sexually abuse children, the Diocese should have anticipated Kloster, Pichette and Zedar would have special access to John providing opportunity through their roles as priests, teacher, and principal to sexually abuse John when left unsupervised at St. Thomas and Seton.

195.    The Diocese failed to act reasonably through its failure to supervise Kloster as he served as priest, Pichette as he served as priest and teacher, and Zedar as he served as priest and principal.

196.    The Diocese's negligent supervision of Kloster, Pichette, and Zedar caused John to be sexually abused by:

       a.    Kloster through his hugs, kisses, and make outs following the 5:20 P.M. mass;

       b.    Pichette through his kisses, fondling, demands for oral sex, masturbation on John and repeated rapes of John, at Seton, Pichette's Cabin, Greek Peak, and Mount Tremblant; and

       c.    Zedar through his kisses, fondling and repeated rapes at Seton, Zedar's residence (owned by the Diocese), and Wildwood, New Jersey

197.    John is entitled to damages in an amount to be determined at the trial of this action.

## COUNT X

## NEGLIGENT FAILURE TO REPORT CHILD ABUSE OR MALTREATMENT (NEGLIGENCE PER SE)

### *John J. Connerton, Jr. v. The Institutional Defendants*

198.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in preceding paragraphs as though fully set forth herein.

199.    Pursuant to NY CLS Soc Serv § 413 (effective 1971), the Diocese through its operation of Seton and St. Thomas has a duty to report actual or suspected child abuse or maltreatment.

200.    Upon information and belief, the Diocese knew of or suspected John was subject to child abuse and/or maltreatment at the hands of Kloster and/or Pichette and/or Zedar or should have known or suspected John was subject to child abuse and/or maltreatment at the hands of Kloster and/or Pichette and/or Zedar.

201.    At no time did the Diocese report suspected or actual child abuse and/or maltreatment committed against John by Kloster and/or Pichette and/or Zedar.

202.    Pursuant to NY CLS Soc Serv § 420[2] (effective 1973) any person, official or institution required to report a case of suspected child abuse or maltreatment and knowingly and willfully fails to do so shall be held civilly liable for the damages proximately caused by such failure.

203.    John is entitled to damages in an amount to be determined at the trial of this action.

## COUNT XI

### AIDING AND ABETTING KLOSTER, PICHETTE AND ZEDAR TO COMMIT BATTERY

*John J. Connerton, Jr. v. The Institutional Defendants*

204.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in preceding paragraphs as though fully set forth herein.

205.    The Diocese/Institutional Defendants encouraged Kloster, Pichette, and Zedar to commit battery against John because it was complicit in facilitating and concealing a pattern of sexual abuse against minors.

206.    The Diocese/Institutional Defendants' encouragement was a substantial factor in causing battery against John by Kloster, Pichette, and Zedar because the Diocese failed to remove known pedophiles from its ranks, which provided Kloster, Pichette and Zedar access and opportunity to sexually abuse John.

207.    The Diocese/Institutional Defendants knew that its facilitation and concealment of Kloster, Pichette, and Zedar's sexual abuse would provide Kloster, Pichette, and Zedar substantial assistance in carrying out sexual abuse against a minor for their own sexual gratification.

208.    John is entitled to damages in an amount to be determined at the trial of this action.

## COUNT XII

## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO)

### *John J. Connerton, Jr. v. All Defendants*

209.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in preceding paragraphs as though fully set forth herein.

210.    The Defendants are "persons" or entities within the meaning of 18 U.S.C. § 1962 who conducted the affairs of an enterprise through a pattern of racketeering activity in violation of 18 USC § 1962.

211.    The institutional Defendants are an association-in-fact within the meaning of 18 USC § 1961(4).  Specifically, the Diocese, Seton and St. Thomas are ongoing business entities (enterprise) that functions as a continuing unit.  The Institutional Defendants were used as a tool to effectuate the Defendants' pattern of racketeering.

212.    Such violations were committed by Kloster, Pichette, Zedar, and members of the Diocese's hierarchy acting on behalf of the Institutional Defendants.

213.    Defendants have violated 18 USC § 1962 by engaging in a pattern of racketeering activities of sexual assault, wire and mail fraud and obstruction of justice.

214.    The Diocese was involved in interstate commerce and trafficking as it allowed the priests to take minors over state lines to sexually abuse them: Pichette took John to Canada, and Zedar took John to New Jersey.  Then, in order to conceal the illicit activities, the Diocese transferred priests that were abusing minors to other states: Pichette to West Virginia and Zedar to Florida.

215.    Such racketeering activities were conducted for the purpose of protecting the reputation and assets of the Diocese, St. Thomas, and Seton in light of the Diocese's knowledge

of sexual abuse within its enterprise, and in furtherance of the Diocese's scheme to solicit funds in the form of tuition, donations and gifts from unknowing parents, parishioners, and devout Catholics over the course of several decades.

216.    This pattern of racketeering activity caused John, his family and others to experience injury through the loss of property in the form of tuition payments, donations and gifts.

217.    Such injury was a direct consequence Defendants' use of mail and wire to communicate plans to relocate and reassign priests suspected and/or accused of sexually abusing minors, obtaining money and/or to conceal ongoing illicit activities.

218.    Further, the Defendants repeatedly obstructed justice through their failure to report suspected and actual sexual abuse of minors pursuant to NY CLS Soc Serv § 413 and through their failure to provide details of alleged and actual sexual abuse to law enforcement, until the publication of the letter dated December 1, 2018, disclosing the identities of priests with credible accusations of sexual abuse made against them.

219.    The Defendants are in violation of both New York and Federal RICO provisions.

220.    John is entitled to damages in an amount to be determined at the trial of this action.

**PRAYER FOR RELIEF**

WHEREFORE, for the foregoing reasons, Plaintiff requests that the Court enter judgment in its favor and against Defendants Robert Kloster, David Pichette and the Roman Catholic Diocese of Syracuse as follows:

I.       Awarding to Plaintiff compensatory damages in an amount to be determined at trial of this action;

II.      Awarding to Plaintiff pain and suffering damages in an amount to be determined at the trial of this action;

III.     Awarding to Plaintiff special damages in an amount to be determined at trial of this action;

IV.      Awarding punitive damages;

V.       Awarding to Plaintiff treble damages;

VI.      Awarding Attorneys' Fees;

VII.     Awarding Costs; and

VIII.    Awarding other such relief as the Court may deem just and appropriate.


Dated:  February 14, 2020              By: */s/ Jeanette N. Warren*
        Binghamton, New York               James S. Gleason, Esq.
                                            Jeanette N. Warren, Esq..
                                            Hinman, Howard & Kattell, LLP
                                            *Attorneys for Plaintiff*
                                            80 Exchange Street
                                            PO Box 5250
                                            Binghamton, New York 13902-5250
                                            [Telephone:  (607) 723-5341]

33